# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 03 B 51878 |
| | ) | Chapter 7 |
| ELIZABETH CLARK, | ) | Judge John H. Squires |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ELIZABETH CLARK, | ) | Adversary No. 05 A 01388 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the complaint filed by Elizabeth Clark (the "Debtor") which seeks a finding that the debt owed by her to the United States Department of Education ("Education") is dischargeable pursuant to 11 U.S.C. § 523(a)(8). For the reasons set forth herein, the Court finds that the debt is not dischargeable under the § 523(a)(8) "undue hardship" exception.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

-2-

## II. FACTS AND BACKGROUND

The parties have stipulated to many of the facts in this matter. In 1997, the Debtor earned certification as a radiological technologist from the University of Chicago/Roosevelt University. (Stipulation of Facts and Admissibility of Evidence ¶ 12.) In 1997, the Illinois Department of Nuclear Safety issued the Debtor a license as a radiological technologist, a requirement under Illinois law. (*Id.* ¶ 13.) Each year since 1997, the Debtor has renewed her license. (*Id.* ¶ 14.)

In order to pay for her educational training, the Debtor obtained the loans that are at issue in this matter. (*Id.* ¶ 18.) On May 19, 1998, the Debtor applied to Education to consolidate her student loans. (*Id.* ¶¶ 16 & 17; Education Ex. No. 1.) On July 9, 1998, the unpaid balances of the Debtor's student loans were consolidated into a single student loan under Education's William D. Ford Federal Direct Consolidation Loan Program[1] (the "direct consolidated loan") pursuant to a promissory note signed by the Debtor. (Stip. of Facts ¶¶ 18 & 22; Education Ex. No. 2; Debtor Ex. No. 5.) At that time, the Debtor's direct consolidated loan principal totaled $33,889.36. (*Id.*) Prior to executing the direct consolidated loan note, the Debtor received a publication entitled, "Borrower's Rights and Responsibilities," as well as a form designated "Repayment Plan Selection." (Stip. of Facts ¶¶ 19-21; Education Ex. Nos. 3 & 4.) In the publication, four different options for repaying the direct consolidated loan were explained. (Education Ex. No. 3.) The Debtor acknowledged her receipt and understanding of both documents. (Education Ex. No. 2.)

---

[1] The William D. Ford Federal Direct Consolidation Loan Program is a student loan program created and administered by the United States. 34 C.F.R. § 685.100(a) (2005).

-3-

Education assigned the Debtor the standard repayment plan to repay her direct consolidated loan.[2] (Stip. of Facts ¶ 24.) In July 1998, Education informed the Debtor that her direct consolidated loan balance was $33,576.75,[3] that her monthly installment payment would be $402.38, that the loan term was ten years, and that the installment payments would begin on August 28, 1998 and end on October 28, 2007. (*Id.* ¶ 25.) The Debtor never made a payment. Rather, she submitted a general forbearance request to Education for the period August 28, 1998 through July 28, 1999. (*Id.* ¶ 26; Debtor Ex. No. 6.) That request was granted. (Education Ex. No. 9.) Thereafter, the Debtor submitted four more forbearance requests to Education for the periods August 28, 1999 through July 28, 2000, August 28, 2000 through July 28, 2001, August 28, 2001 through July 28, 2002, and August 28, 2002 through July 27, 2003. (Stip. of Facts ¶¶ 29, 32, 34, & 37; Debtor Ex. Nos. 7, 8, 9, & 10.) All of those forbearance requests were granted. (Education Ex. No. 9.) Although Education agreed to forbear with respect to the installment payments otherwise due from and payable by the Debtor, interest continued to accrue on the unpaid principal during the forbearance periods.

---

[2] When a borrower fails to select a repayment plan option, Education's regulations require that the borrower be assigned repayment under the standard repayment plan. 34 C.F.R. § 685.210(a)(2) (2005). On the repayment plan selection form, the Debtor checked two boxes: the income contingent repayment plan and the extended repayment plan. (Education Ex. No. 4.) In light of the Debtor's selections, it is unclear why Education assigned her the standard repayment plan.

[3] The Court recognizes that this amount is different from the figure reflected on the promissory note. (Education Ex. No. 2; Debtor Ex. No. 5.) It is unclear why this sum is approximately $300.00 less than the initial amount when the Debtor had not made any payments on the direct consolidated loan at that time.

-4-

On October 17, 2003, at the Debtor's request, Education changed the direct consolidated loan repayment plan from the standard plan to the graduated repayment plan. (Stip. of Facts ¶ 43; Education Ex. No. 9, p. 9.) This change resulted in the reduction of the Debtor's monthly installment payment from $402.38 to $182.66, with the payment increasing every two years by approximately $17.00; in the final two years of repayment, 2018 and 2019, installments were to be $333.00 per month. (Stip. of Facts ¶ 43.) The Debtor has made only two $15.00 payments (on December 30, 2002 and March 20, 2003) for a total of $30.00 on the direct consolidated loan principal. (Education Ex. No. 9, p. 9.) According to Lola Horn ("Horn"), a senior loan analyst with Education, the current loan balance is in excess of $46,000.00. (*See also* Debtor Ex. No. 12)

From May 1997 through August 1998, the Debtor worked for the Weinberg Cancer Care Center ("Weinberg") as a radiation therapist. (Stip. of Facts ¶ 15.) The Debtor testified that as a radiation therapist she administers prescribed radiation to cancer patients.[4] From September 1998 through December 1999, the Debtor worked as a radiation therapist for Catholic Health Partners and Saint Joseph Hospital ("Catholic Health"). (*Id.* ¶ 27.) She again worked for Weinberg from January 2000 through September 2001. (*Id.* at ¶ 30.) From September 2001 through April 2002, the Debtor went back to work for Catholic Health as a radiation therapist. (*Id.* ¶ 33.) From June 2002 through April 2004, she was employed by Loyola University Medical Center ("Loyola"). (*Id.* ¶ 40.) In the years 2004 and 2005, the

---

[4] The stipulation of facts and the Debtor's testimony vary with respect to her occupation. The stipulation stated that the Debtor is a radiological technologist. (Stip. of Facts ¶¶ 12-14, 40, 49, & 51.) However, the Debtor testified that she is a radiation therapist. The Court notes that a radiological technologist differs from a radiation therapist in terms of, *inter alia*, requisite job knowledge, responsibilities, and compensation.

-5-

Debtor was employed by Medcor Staffing, Inc. (*Id.* ¶ 49.) The Debtor's Schedule I listed

Loyola as her employer at the time of the filing of the bankruptcy petition–December 29,

2005–and indicated that she had been employed by Loyola for 18 months. (Debtor Ex. No.

11, Schedule I., Education Ex. No. 8.) Since January 2006, the Debtor has been employed

by Provena Saint Joseph Hospital in Elgin, Illinois, as a radiation therapist. (Stip. of Facts

¶ 51.)

The Debtor is 34 years old. (*Id.* ¶ 9.) Since 1999, her primary care physician has

been Dr. Kew-Jung Lee ("Dr. Lee").[5] (*Id.* ¶ 28.) Dr. Lee testified that he is board certified

as a family practitioner and has been licensed as a physician in Illinois since 1996. He

admitted that he does not have any special education in the area of rheumatology. Dr. Lee

testified that in April of 2003, he diagnosed the Debtor with fibromyalgia. According to Dr.

Lee, the Debtor's fibromyalgia is characterized by persistent pain in multiple parts of her

body, including her knees, hips, back, and shoulders. In addition, the Debtor suffers from

headaches, fatigue, sleep disturbance, and gastrointestinal problems, all symptoms known

to be associated with fibromyalgia.

Dr. Lee stated that there is no cure for fibromyalgia. He said that stress aggravates

many of the symptoms, and, therefore, he recommended to the Debtor that she reduce the

stress in her life. Dr. Lee testified that he treats the Debtor's symptoms with numerous

medications, including pain killers and antidepressants. In spite of the Debtor's diagnosed

---

[5] The Debtor submitted a portion of her medical records from Dr. Lee. (Debtor Ex. No. 1.) Those records are from the period November 1, 2004 through September 2, 2005. (*Id.*) Unfortunately, many of the records are illegible and, thus, afford little insight into the details of the Debtor's medical history.

-6-

fibromyalgia, Dr. Lee asserted that the Debtor is able to work. According to Dr. Lee, there

are some days when the Debtor cannot work because of her pain. However, he explained

that her medical condition does not render her disabled, nor does it prevent her from working

for long periods of time. In conclusion, Dr. Lee testified that overall, in the past three years,

the Debtor's condition has stayed the same.

On March 16, 2000, the Debtor filed for a dissolution of her marriage to her second

husband, Fezo Pekovic ("Pekovic"). (*Id.* ¶ 31.) On July 12, 2002, a judgment of dissolution

was entered. (*Id.* ¶ 35.) Pursuant to that judgment, Pekovic is ordered to pay the Debtor

child support twice a month in the sum of $265.00 for their son, Timothy, who is nine years

old. (*Id.*) According to the Debtor, Pekovic is current with his child support payments. The

Debtor testified that she has a 13-year-old son, Ethan, from her first marriage to Jeffrey Lake

("Lake"). She stated that Lake pays her $500.00 per month for child support and that he is

in arrears only one month.

In December 2003, the Debtor married her third and current spouse, Michael Laspisa

("Laspisa").[6] (*Id.* ¶ 44.) The Debtor and Laspisa had a child, Michael, in August 2004. (*Id.*

¶ 48.) Since December of 2003, the Debtor and her three children have resided with Laspisa

in a single-family home that they rent for $1,600.00 per month. (*Id.* ¶ 45.) According to the

Debtor, as of February 2006, she and Laspisa were seven months behind on the rental

payment.

Laspisa is an electrician who operates his business from home. (*Id.* ¶ 46.) The

Debtor testified that Laspisa works sporadically and often exchanges his services with those

---

[6] Since marrying Michael Laspisa, the Debtor is now known as Elizabeth Laspisa.

-7-

of his friends, including a landscaper who performs landscaping services on the property that the Debtor and Laspisa rent. According to the Debtor, Laspisa has not earned any income since November 2005. The Debtor testified that Laspisa has a friend who often loans him money so that the family can pay their monthly bills. The Debtor stated that she does not have any savings with which to repay the direct consolidated loan and that she does not foresee earning enough income in the future to repay the loan in full.

In 2002, 2003, and 2004, the Debtor earned gross amounts of $54,895.00, $57,116.00, and $10,569.00, respectively. (*Id.* ¶¶ 38 & 39; Education Ex. Nos. 6 & 7; Debtor Ex. Nos. 2 & 3.) In 2004, Laspisa earned $15,459.00. (Debtor Ex. No. 4.) In 2005, the Debtor's gross income was $12,976.50, and Laspisa estimated his taxable income at $9,000.00 to $10,000.00. (Stip. of Facts ¶ 50.) The Debtor testified that she currently earns $32.00 per hour as a radiation therapist at Provena Saint Joseph Hospital.

The Debtor filed a Chapter 7 bankruptcy petition on December 29, 2003. (*Id.* ¶¶ 1 & 2; Education Ex. No. 8; Debtor Ex. No. 11.)[7] The Debtor's Schedule J indicated that her living expenses at that time were as follows:

| | |
|---|---|
| Rent | $1,600.00 |
| Water | $ 220.00 |
| Gas and electric | $ 323.00 |
| Other | $ 56.00[8] |
| Telephone | $ 406.00 |
| Clothing | $ 160.00 |
| Laundry and dry cleaning | $ 95.00 |

---

[7] On April 21, 2004, the Debtor received a discharge pursuant to 11 U.S.C. § 727(a). (Stip. of Facts ¶ 8.)

[8] The Debtor did not indicate on her Schedule J what comprises the $56.00 figure in the "other" category.

-8-

| | | |
|---|---|---|
| Food | $ | 905.00 |
| Transportation (not including car payment) | $ | 424.00 |
| Home maintenance | $ | 260.00 |
| Medical and dental expenses | $ | 380.00 |
| Recreation, clubs, and entertainment | $ | 140.00 |
| Charitable contributions | $ | 40.00 |
| Auto insurance | $ | 100.00 |
| Renter's insurance | $ | 26.00 |
| Car payment | $ | 599.50[9] |
| Daycare, babysitting, summer camp | $ | 505.00 |
| | | |
| Total Monthly Expenses | | $6,239.50 |

(Education Ex. No. 8, Schedule J; Debtor Ex. No. 11, Schedule J.) The Debtor testified that

there have been some changes to her monthly expenses since she filed her bankruptcy

petition. She stated that her Schedule J does not include the gas bill, which averages $200.00

per month.[10] Additionally, the Debtor testified that her monthly rental payment has increased

by $80.00 and that her food bill also has increased by approximately $120.00 per month

because she purchases baby formula for her youngest child. Thus, based on the Debtor's

Schedule J and her testimony, the current monthly expenses for the Debtor, her husband, and

the three children total $6,439.50.

---

[9] The Debtor's Schedule D lists a 1999 Oldsmobile Aurora. The Debtor testified, however, that the Aurora was repossessed. According to the Debtor, in September 2003, she financed the purchase of a Chevrolet Tahoe. The Debtor's schedules do not reflect the Tahoe, nor do they list the lender. The Debtor testified that the purchase price for the vehicle was $42,000.00. According to the Debtor, a friend purchased the vehicle for her as a gift. However, the Debtor testified that she is responsible for making the $600.00 monthly payments. The Court finds that the Debtor's own testimony that she is responsible for making the payments belies her assertion that the vehicle was purchased for her as a gift.

[10] The Debtor's Schedule J estimated her monthly gas and electric bills at $323.00. Thus, the Court is perplexed by the Debtor's testimony that her Schedule J does not include her monthly gas bill.

-9-

According to her Schedule I, the Debtor's total net monthly income is $3,062.62. (Education Ex. No. 8, Schedule I; Debtor Ex. No. 11, Schedule I.) This sum includes her monthly wages, as well as the child support payments she receives. (*Id.*) The Debtor testified that her health insurance costs are different from those reflected in her Schedule I.[11] She contends that she now pays approximately $520.00 per month for health insurance while employed by Provena Saint Joseph Hospital. According to the Debtor, every two weeks her take home pay is approximately $1,100.00. In addition, she receives $1,030.00 in monthly child support from her two ex-husbands, for a total monthly income of $3,230.00.

On May 31, 2005, the Debtor filed the instant adversary proceeding seeking to have the direct consolidated loan debt discharged under 11 U.S.C. § 523(a)(8). (Stip. of Facts ¶ 3.) On February 13 and 14, 2006, the Court held a trial and thereafter took the matter under advisement.

## III. APPLICABLE STANDARDS

### A.   Exceptions to the Discharge of a Debt

The main purpose of a discharge in bankruptcy is to give a debtor a fresh start. *See Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 961 (Bankr. N.D. Ill. 1995). The United

---

[11] The Debtor's Schedule I reflects monthly insurance of $151.80 deducted from her pay, which, according to the Debtor, was the amount she paid while she was employed by Loyola.

-10-

States Supreme Court has held that the burden of proof required to establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *see also In re McFarland*, 84 F.3d 943, 946 (7th Cir. 1996); *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). Exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *Shaw Steel v. Morris*, 223 F.3d 548, 552 (7th Cir. 2000); *Kolodziej v. Reines (In re Reines)*, 142 F.3d 970, 972-73 (7th Cir. 1998); *Goldberg Secs. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985). "The statute is narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001). Student loan debts are among the debts that Congress has excepted from discharge pursuant to 11 U.S.C. § 523(a)(8).

**B.    11 U.S.C. § 523(a)(8)**

Section 523 of the Bankruptcy Code enumerates specific, limited situations in which certain debts are excluded from the general discharge afforded to debtors. Student loan debts are presumptively nondischargeable in bankruptcy. *In re Hanson*, 397 F.3d 482, 484 (7th Cir. 2005). However, a debtor can overcome this presumption by showing that excepting such debt from discharge would impose an undue hardship on the debtor and his dependents. *Id.* Section 523(a)(8) provides for this "undue hardship" exception and states in relevant part as follows:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt–

-11-

> (8)  for an educational benefit overpayment or
> loan made, insured or guaranteed by a
> governmental unit, or made under any
> program funded in whole or in part by a
> governmental unit or nonprofit institution, or
> for an obligation to repay funds received as an
> educational benefit, scholarship or stipend,
> unless excepting such debt from discharge
> under this paragraph will impose an undue
> hardship on the debtor and the debtor's
> dependents[.]

11 U.S.C. § 523(a)(8). "The purpose of section 523(a)(8) is to ensure that the funds available to finance higher education are not depleted by individuals exploiting both student loan programs and the Code by taking out loans, gaining an education, discharging the debt, and then taking advantage [of] the higher earning power with no debt." *Joint Apprenticeship Comm. of United Ass'n Local Union No. 307 v. Rezendes (In re Rezendes)*, 324 B.R. 689, 693 (N.D. Ill. 2004).

Congress created a presumption that student loans are nondischargeable, and, therefore, the burden of challenging that presumption falls on the debtor. *United States v. Wood*, 925 F.2d 1580, 1583 (7th Cir. 1991). "The legislative history of section 523(a)(8) indicates that the statute was meant to be self-executing so that the creditor would not be required to file a complaint to determine the dischargeability of a student loan." *Id.* Thus, it is the debtor who is required to file an adversary proceeding against the holder of a student loan debt in order to show that the debt should be discharged. *Hanson*, 397 F.3d at 484.

The Bankruptcy Code does not define the term "undue hardship." *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003); *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002). Moreover, the legislative history

-12-

provides no meaningful guidance. *O'Hearn*, 339 F.3d at 564. Nevertheless, the Seventh

Circuit has adopted a three-pronged test to determine whether excepting unpaid student loans

from discharge will impose an undue hardship upon debtors. *Id.*; *Goulet*, 284 F.3d at 777;

*In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993).[12] Under this test, a debtor must

demonstrate: (1) that she could not maintain, based on her current income and expenses, a

minimal standard of living for herself and her dependents if she were required to repay the

loan; (2) that additional circumstances exist indicating that this state of affairs is likely to

persist for a significant portion of the repayment period of the student loan; and (3) that the

debtor has made good faith efforts to repay the student loan. *Id.* A debtor must prove each

element of the test by a preponderance of the evidence. *O'Hearn*, 339 F.3d at 565; *Goulet*,

284 F.3d at 777. If a debtor fails to establish any one of the elements, she has failed to meet

her burden, and the court need not proceed with the inquiry because the debt remains

nondischargeable. *Id.*; *Roberson*, 999 F.2d at 1135. The Court will discuss each prong of

the three-part test in turn.


## IV. DISCUSSION

### A.    Minimal Standard of Living

The first prong of the test requires an analysis of the debtor's current standard of

living. *Roberson*, 999 F.2d at 1135. In order to satisfy the first element, a debtor must show

that she lacks the present ability to repay the loan and at the same time maintain a minimal

---

[12] The Seventh Circuit adopted the test articulated by the Second Circuit in *Brunner
v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir. 1987). The test
is often referred to as the "Brunner test."

-13-

standard of living for herself and her dependents. *Id.* In other words, the court must

determine whether the payment of the loan "'would cause [the debtor's] standard of living

to fall below that minimally necessary.'" *O'Hearn*, 339 F.3d at 564 (*quoting Roberson*, 999

F.2d at 1135). A "minimal" standard of living is determined without regard for expenses that

are not necessary, and, if eliminated, that would provide funds that could be directed toward

repayment of the loan. *See Berchtold v. Educ. Credit Mgmt. Corp. (In re Berchtold)*, 328

B.R. 808, 814 (Bankr. D. Idaho 2005). Thus, this prong requires a two-part analysis: (1) an

evaluation of the debtor's present standard of living based upon her lifestyle attributes that

appear in the record, and (2) a determination of whether the forced repayment of the loan

obligation will preclude the debtor from maintaining a minimal standard of living. *Barron*

*v. Tex. Guaranteed Student Loan Corp. (In re Barron)*, 264 B.R. 833, 840 (Bankr. E.D. Tex.

2001).

A court must determine the amount of money "minimally necessary" to ensure that

the debtor's needs for care, including food, shelter, clothing, and medical treatment, are met.

*Gill v. Nelnet Loan Servs., Inc. (In re Gill)*, 326 B.R. 611, 626 (Bankr. E.D. Va. 2005);

*Salinas v. United Student Aid Funds, Inc. (In re Salinas)*, 258 B.R. 913, 918 (Bankr. W.D.

Wis.), *rev'd on other grounds*, No. 01-C-234-S, 2001 WL 829951 (W.D. Wis. June 13,

2001) ("*Salinas II*"). A debtor does not have to "live in abject poverty." *Pa. Higher Educ.*

*Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 305 (3d Cir. 1995); *see also Kehler*

*v. Nelnet Loan Servs. (In re Kehler)*, 326 B.R. 142, 147 (Bankr. N.D. Ind. 2005) ("*Roberson*

does not require the debtor to live at or below [the] poverty level in order to repay the loan.").

Nevertheless, debtors are expected to live within the strictures of a frugal budget for the

·14·

foreseeable future. *Ritchie v. Nw. Educ. Loan Ass'n (In re Ritchie)*, 254 B.R. 913, 917-18 (Bankr. D. Idaho 2000). A debtor cannot succeed under this first prong by showing that the repayment of the loan would require her to make major personal and financial sacrifices and to live within a restricted budget. *Kehler*, 326 B.R. at 147; *Salinas v. United Student Aid Funds, Inc. (In re Salinas)*, 240 B.R. 305, 313 (Bankr. W.D. Wis.), *rev'd on other grounds*, 262 B.R. 457 (W.D. Wis. 1999) ("*Salinas I*"). The mere fact that repayment of the loan may impose a hardship on the debtor is not enough to allow dischargeability. *Salinas I*, 240 B.R. at 313. Moreover, a debtor's financial distress cannot be of her own creation. *Id.* at 314. Once a court determines the amount necessary for a debtor to maintain a minimal standard of living, the inquiry turns to whether the debtor has any additional funds with which to repay the student loan. *Id.* If not, then the court must determine whether that lack of financial ability is likely to continue into the future, not whether the inability is certain to do so. *Roberson*, 999 F.2d at 1135-36.

In deciding whether the Debtor can maintain a minimal standard of living if required to repay the direct consolidated loan, the Court must look to her monthly income and expenses. The Court may find that some of the Debtor's monthly expenses are necessary for her to maintain a minimal standard of living and that others are not. *See Bard-Prinzing v. Higher Educ. Assistance Found. (In re Bard-Prinzing)*, 311 B.R. 219, 229 (Bankr. N.D. Ill. 2004). In determining the Debtor's disposable income for purposes of § 523(a)(8), it is appropriate to calculate disposable income as in Chapter 13 cases pursuant to 11 U.S.C. §

-15-

1325(b)(2).[13] *See Sequeira v. Sallie Mae Servicing Corp. (In re Sequeira)*, 278 B.R. 861, 865 (Bankr. D. Or. 2001).

The evidence demonstrates that, at the time of trial, the Debtor's current monthly expenses totaled $6,439.50 and her monthly income was approximately $3,230.00. The latter figure does not include Laspisa's income. The parties have stipulated that his taxable income for 2005 was approximately $9,000.00 to $10,000.00. (Stip. of Facts ¶ 50.) Thus, based upon Laspisa and the Debtor's income and current living expenses, the Debtor does not have monthly income in excess of her living expenses.

Education does not suggest that the Debtor can make a meaningful payment on the direct consolidated loan given her current monthly income and expenses. Rather, Education argues that the Debtor's line items for her car payment, gasoline, and other monthly expenses are unreasonable and excessive and that, if such expenses were eliminated or reduced, the Debtor would be able to make a small payment on her direct consolidated loan. The Court agrees.

Rather than make any minimal payments on the loan, the Debtor purchased in September 2003 a vehicle for approximately $42,000.00. This large, luxury sport utility vehicle carries with it a commensurately large monthly payment of $600.00. In addition, the vehicle requires approximately $400.00 per month in gasoline, and the insurance payment for the vehicle is $100.00 per month. These monthly expenses total $1,100.00 and comprise

---

[13] Section 1325(b)(2) defines "disposable income" in pertinent part as "income which is received by the debtor and which is not reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor. . . ." 11 U.S.C. § 1325(b)(2)(A).

·16·

about one-third of the Debtor's total net income. The Court finds that based on these

expenses alone, the Debtor is not maintaining a minimal standard of living. A debtor is

entitled to spend a reasonable amount for the costs associated with owning an automobile.

*Lewis v. Ill. Student Assistance Comm'n (In re Lewis)*, 276 B.R. 912, 917 (Bankr. C.D. Ill.

2002). However, a $600.00 monthly payment for an expensive sport utility vehicle is

unreasonable and excessive for a debtor who has made only $30.00 in payments on her direct

consolidated loan. *See id.* (finding that a $373.00 per month car payment is at the high end

of the range regarded as reasonable).

Other evidence also demonstrates that the Debtor does not lead a frugal lifestyle and

that she spends improvidently. The Debtor enjoys a healthy monthly allotment for food,

housing, and medical expenses. Moreover, various costs reflected on the Debtor's Schedule

J seem excessive and overinflated, such as the water bill of $220.00 per month, $95.00 a

month for laundry and dry cleaning, and a mammoth monthly telephone bill of over $400.00.

In addition, the Debtor has failed to explain the $56.00 "other" category in her monthly

expenses and has allocated $140.00 for recreation and entertainment, an unreasonable sum

under the facts and circumstances of this case. Further, it is unclear why the Debtor pays

$260.00 per month for home maintenance when she does not own the home in which she

resides. Finally, the family's daycare and babysitting costs of $505.00 per month are

unnecessary in light of the fact that Laspisa is home and available to take care of the

children.[14]

---

[14] Laspisa runs his business from home (Stip. of Facts ¶ 46), and the Debtor testified
that he has not earned any income since November 2005.

·17·

In sum, the Court finds that the Debtor's excessive expenses do not reflect those amounts only minimally necessary for food, shelter, clothing, and medical treatment. In addition, the Court finds that the Debtor has not made the slightest effort to minimize her expenses. If she trimmed some of the fat from her budget, such as telephone service, recreation and entertainment, and "other" unspecified items, and utilized less expensive automotive transportation, she would be able to make the $182.66 monthly payment on the direct consolidated loan. In short, the Debtor's monthly expenses demonstrate that she and her dependants are not maintaining a minimal standard of living. Rather, the Debtor has chosen to spend excessively while ignoring her obligation to repay the direct consolidated loan.

Next, the Court will discuss the Debtor's monthly income. The Debtor is employed as a radiation therapist by Provena Saint Joseph Hospital. She has been employed there for only a few months. According to the Debtor, she earns approximately $32.00 per hour. The Debtor testified that during the week prior to the trial (February 6-10, 2006), she worked three-and-a-half days. She stated that she earns a net salary of $1,100.00 twice a month and receives $1,030.00 in monthly child support payments for a total monthly income of $3,230.00.

As for Laspisa, the Debtor testified that he has not brought home any income since November of 2005. She stated that he often exchanges his services as an electrician with those of a friend who does landscaping on their rental property. In 2004, Laspisa earned $15,459.00. (Debtor Ex. No. 4.) For 2005, he estimated that his taxable income would be $9,000.00 to $10,000.00. (Stip. of Facts ¶ 50.)

-18-

The Court finds that the Debtor and her spouse have not maximized their income.[15] The Debtor's work history and Dr. Lee's testimony show that even with the fibromyalgia, the Debtor is capable of working full time and earning in excess of $50,000.00 per year. Certainly, based on this income, she could make the $182.66 monthly payment on the direct consolidated loan under the graduated repayment plan. Moreover, the Debtor's spouse could be earning income for the family unit rather than bartering his services as an electrician for landscaping work on property that he and the Debtor rent.

Under all of the circumstances in this matter, the Court concludes that the Debtor has not established the first prong of the test.[16] The Court finds that if forced to repay the direct consolidated loan obligation, the Debtor will be able to maintain a minimal standard of living.

**B.    Additional Circumstances to Indicate That the Debtor's State of Affairs Will Persist**

The second prong of the test requires an analysis of the factors that contribute to a debtor's inability to pay a loan and a determination of whether additional circumstances exist which indicate that her state of affairs will likely persist for a significant portion of the repayment period. *Goulet*, 284 F.3d at 777; *Roberson*, 999 F.2d at 1135; *Simmons v. United States Dep't of Educ. (In re Simmons)*, 334 B.R. 632, 636 (Bankr. C.D. Ill. 2005). This

---

[15] The Court may consider the non-debtor spouse's income for purposes of analyzing the Debtor's current standard of living. *See Gill*, 326 B.R. at 626-27; *White v. United States Dep't of Educ. (In re White)*, 243 B.R. 498, 508-10 (Bankr. N.D. Ala. 1999).

[16] Even though the *Roberson* court noted that the other prongs of the test need not be examined if the first prong has not been satisfied, 999 F.2d at 1135, the Court will analyze the remaining two prongs in the event of an appeal of this decision.

-19-

second prong "properly recognizes the potential continuing benefit of an education, and imputes to the meaning of 'undue hardship' a requirement that the debtor show his dire financial condition is likely to exist for a significant portion of the repayment period." *Roberson*, 999 F.2d at 1135-36 (internal quotation omitted).

Recently, in *Goulet*, the Seventh Circuit addressed the "additional, exceptional circumstances" necessary to satisfy the second prong of the test. 284 F.3d at 778; *see also O'Hearn*, 339 F.3d at 564. Specifically, the court noted that a debtor must demonstrate the "certainty of hopelessness"–not just a present inability to fulfill the financial commitment– in order for payment of the student loan to be considered an undue hardship. *Goulet*, 284 F.3d at 778. The "certainty of hopelessness" requires evidence that would lead a court "to believe [that the debtor] will lack the ability to repay for several years." *Id.* "'Certainty of hopelessness' is a tough standard and one that can generally . . . be met [only] by the truly disabled or debtors whose repayment periods have already run so that the certainty of their inability to pay for the entire period is a matter of fact rather than speculation." *Simmons*, 334 B.R. at 636.

"The test is not . . . that a debtor must demonstrate [that] his future holds an 'absolute' certainty of hopelessness, but rather that there be additional circumstances which make it reasonably certain that the debtor's circumstances are unlikely to improve." *Hoskins*, 292 B.R. at 887. As one court has pointedly noted:

·20·

> [T]he function of the court is not to serve as a medium with a crystal ball or a cup of tea leaves. To suggest that the court's role as finder of fact is to ascertain the "certainty" of the future is to set an impossible task before those with imperfect vision.

*Salinas I,* 240 B.R. at 314.

To demonstrate that a debtor's current state of affairs is likely to persist for a significant portion of the repayment period of the student loan, a debtor must precisely identify her problems and explain how her condition will impair her ability to work in the future. *Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch),* 409 F.3d 677, 681 (6th Cir. 2005). In a situation like the one at bar in which health problems have contributed to a debtor's financial hardship, the court must determine if the debtor's physical condition actually impairs her ability to work. *Brown v. Educ. Credit Mgmt. Corp. (In re Brown),* 247 B.R. 228, 233 (Bankr. N.D. Ohio 2000). If the court determines that the debtor's physical condition does impair her ability to work, then the court must ascertain whether the debtor's condition will likely persist for a significant portion of the loan repayment period. *Hoskins v. Educ. Credit Mgmt. Corp. (In re Hoskins),* 292 B.R. 883, 888 (Bankr. C.D. Ill. 2003); *Brown,* 247 B.R. at 234; *see also Salinas I,* 240 B.R. at 315 (stating that when considering a debtor's future financial prospects, the financial, physical, or mental hardship that may have precluded the debtor's current or past ability to repay the student loan must appear likely to continue indefinitely into the future).

-21-

The primary dispute under the second element in this matter centers on the Debtor's asserted fibromyalgia[17] and whether this physical condition constitutes sufficient "additional, exceptional circumstances." A serious illness has been recognized as one of the most frequent bases for demonstrating unique or exceptional circumstances. *Hoskins*, 292 B.R. at 887-88. Nevertheless, the mere existence of a medical condition, even a severe one, is insufficient to form the basis of an undue hardship. *Lowe v. ECMC (In re Lowe)*, 321 B.R. 852, 859 (Bankr. N.D. Ohio 2004). Rather, a strong nexus between the medical condition and its adverse effect on the debtor's employment, specifically the debtor's income, must be demonstrated. *Id.* If health problems contribute to a debtor's sub-minimal standard of living,

---

[17] The Seventh Circuit explained fibromyalgia as follows:

> [F]ibromyalgia, "also known as fibrositis[,] [is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and–the only symptom that discriminates between it and other diseases of a rheumatic character–multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. . . ."

*Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003) (*quoting Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996)); *see also Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833, 842 (8th Cir. 2006) (*quoting Hawkins*) (Bye, J., dissenting). In addition, the Ninth Circuit has noted that "[o]bjective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872 (9th Cir. 2003) (footnote omitted).

·22·

then the prospect for recovery and defrayal of medical expenses within the repayment period are relevant. *Salinas I*, 240 B.R. at 315.

In 2003, Dr. Lee diagnosed the Debtor with fibromyalgia. Dr. Lee is board certified as a family practitioner, but does not have any special education in the field of rheumatology.[18] Admittedly, the Debtor has never been examined by a rheumatologist, nor has Dr. Lee consulted with such a specialist regarding the Debtor's condition and/or treatment. The most effective way to assess an individual's disability is through the use of a functional capacity evaluation. *Lake v. Hartford Life & Accident Ins. Co.*, 320 F. Supp. 2d 1240, 1246 (M.D. Fla.), *aff'd*, 126 Fed. App. 463 (11th Cir. 2004). It is undisputed that Dr. Lee did not perform nor did the Debtor undergo a functional capacity evaluation.

The Debtor testified that because of her chronic pain, she is unable to work full time. Further, she said that she has changed jobs frequently because her physical ailments cause her to be late or absent from work for extended periods of time and her various employers have not tolerated her tardiness and absences. The evidence before the Court does not support the Debtor's assertion that she is unable to work full time. Significantly, Dr. Lee testified that the Debtor is able to work full time. Moreover, the Debtor has demonstrated in the recent past that she has the capacity to earn over $50,000.00 per year. The 34-year-old Debtor presented herself as a bright, articulate woman. She testified that she graduated at the top of her class.

---

[18]    "Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist." *Sarchet*, 78 F.3d at 307.

-23-

The Debtor's medical records indicated that during the period November 1, 2004 through September 2, 2005 she was seen by Dr. Lee numerous times for various symptoms, including back pain, diarrhea, and a variety of infections. (Debtor Ex. No. 1.) The Debtor testified that she sees Dr. Lee twice a month and calls his office several times per week. It is difficult to discern from Dr. Lee's only partially legible notes, however, what treatment was recommended for the Debtor's various maladies, although it appears from both those records and Dr. Lee's testimony that various medications were prescribed. Despite the Debtor's frequent trips to Dr. Lee's office, he testified that the Debtor's fibromyalgia does not prevent her from working full time. The fact that a person suffers from fibromyalgia does not mean that she is totally disabled and cannot work. *Jordan*, 370 F.3d at 877; *see also Hawkins*, 326 F.3d at 916 ("Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not. . . ."). The testimony in this matter indicated that the Debtor suffers from fibromyalgia but not that it is so severe that she is totally unable to work.

In sum, nothing in the medical records or in Dr. Lee's testimony verifies that the Debtor is either presently unable to work or that she will be unable to work in the future because of her physical limitations and/or pain. Clearly, the Debtor was not disabled at the time of the trial. Indeed, she herself testified that just one week prior to the commencement of the trial, she worked three-and-a-half days. Thus, the Court finds that the Debtor's testimony that she is unable to maintain steady, continuous employment as a result of her physical problems is not supported by the evidence. *See, e.g., Ryan v. Dep't of Educ. (In re*

-24-

*Ryan),* 310 B.R. 387, 390 (Bankr. S.D. Ill. 2004) (finding that evidence failed to support debtor's assertion that she was unable to work because of physical limitations).

The Debtor has failed to satisfy her burden with respect to the second prong of the test. While the Court recognizes that the Debtor has undisputed medical problems resulting from fibromyalgia, the Court does not consider these problems to be of the magnitude of "additional, exceptional circumstances" that would constitute undue hardship under § 523(a)(8). Even though the Debtor is not currently earning sufficient income in her position to make repayment on the direct consolidated loan, the Court finds that she has not established an inability at some point in the future to earn enough income to make such repayment, nor has she shown a certainty of hopelessness. The Debtor has not demonstrated that there are barriers, such as psychiatric problems, lack of usable job skills, or severely limited education, that would lead this Court to conclude that she lacks the ability to repay the loan for several years. *See Goulet,* 284 F.3d at 778; *Roberson,* 999 F.2d at 1137. Further, the Debtor cannot satisfy the second prong when her financial distress is partly self-imposed as a result of her improvident spending and her failure to work full time.

The Court concludes that the Debtor's situation has not reached the "certainty of hopelessness" that would lead the Court to find that her circumstances are likely to persist for a significant portion of the repayment period which concludes in 2019. The Court is sympathetic to the Debtor's physical condition, but the evidence demonstrated that she is presently able to work, and the record is devoid of any evidence to suggest that the Debtor's current state of affairs is likely to persist for the next thirteen years. Indeed, the evidence

-25-

suggests that despite her physical ailments, the Debtor can earn in excess of $50,000.00 per year, which would enable her to make a monthly payment on the direct consolidated loan.

## C.    Good Faith Efforts to Repay the Direct Consolidated Loan

Under this third and final prong, the court must analyze whether a debtor has made a good faith effort to repay the loan. *Roberson*, 999 F.2d at 1136. The good faith inquiry is guided by the precept that "undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control." *Id.* (internal quotation omitted). The inquiry includes a determination of "whether the debtor was negligent or irresponsible in conducting his financial affairs such that the debtor's misfortune is self-imposed." *Id.* (internal quotation omitted). A debtor's good faith to repay a student loan is measured by her efforts to "obtain employment, maximize income, and minimize expenses." *Id.*

The debtor is not required to have paid a certain percentage or minimum amount of the loan in order to show good faith. *Vang v. UW Stout Student Bus. Servs. (In re Vang)*, 324 B.R. 76, 85 (Bankr. W.D. Wis. 2005); *Bard-Prinzing*, 311 B.R. at 228. "If the debtor has not had the financial ability to pay the debt, he will not be penalized as a result." *Vang*, 324 B.R. at 85. A debtor's failure to make any payments does not prevent the court from making a finding of good faith where the debtor never had the resources to make such payments. *Id.* However, to meet the good faith test, a debtor must take advantage of one of the repayment plans available to her if and when she is able to do so. *Bard-Prinzing*, 311 B.R. at 229.

A borrower has control over which repayment plan will be used to repay a William D. Ford Federal Direct Consolidation Loan. Among the choices is the income contingent

-26-

repayment plan. ("ICRP").[19]  34 C.F.R. § 685.209 (2005).  A borrower may change to the

ICRP at any time.  34 C.F.R. § 685.210(b)(2)(i) (2005).  Hom, a senior loan analyst with

Education, testified that the Debtor has never investigated the ICRP.  Whether a debtor has

looked into such a repayment program is often considered a factor in determining good faith.

*Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1206 (10th Cir. 2005);

*Tirch*, 409 F.3d at 682; *Simmons*, 334 B.R. at 637; *Kehler*, 326 B.R. at 149.

The Court finds that the Debtor has not met the third prong of the test.  That is, she

has not made a good faith effort to pay the direct consolidated loan.  The undisputed

evidence shows that the Debtor made only two $15.00 payments on the loan.  (Education Ex.

No. 9, p. 9.)  Making two payments totaling $30.00 on a balance of approximately

$46,000.00 does not reflect good faith.  Thirty dollars is much closer to zero than it is to

$46,000.00.  Further, the Debtor has not made any payments to Education since the

---

[19]  The mechanics of the ICRP have been explained by one court as follows:

> The Income Contingent Repayment [Plan] permits a student
> loan debtor to pay twenty percent of the difference between
> his adjusted gross income and the poverty level for his family
> size, or the amount the debtor would pay if the debt were
> repaid in twelve years, whichever is less.  Under the program,
> the borrower's monthly repayment amount is adjusted each
> year to reflect any changes in these factors.  The borrower's
> repayments may also be adjusted during the year based on
> special circumstances. *See* 34 C.F.R. § 685.209(c)(3).  At the
> end of the twenty five year payment period, any remaining
> loan balance would be cancelled by the Secretary of
> Education.  However, the amount discharged would be
> considered taxable income.

*Tirch*, 409 F.3d at 682 (*quoting Korhonen v. Educ. Credit Mgmt. Corp. (In re Korhonen)*,
296 B.R. 492, 496 (Bankr. D. Minn. 2003)); *see also* 34 C.F.R. § 685.209 (2005).

-27-

bankruptcy filing. "A debtor's obligation to make 'good faith' efforts to repay [her]

educational loans is not extinguished with the filing of an adversary proceeding in

bankruptcy." *United States Dep't of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 185

(C.D. Cal. 2000). Finally, the Debtor's purchase of the new sport utility vehicle during the

loan repayment period was a self-imposed and excessive liability. The purchase of a new

vehicle is considered a "self-imposed hardship." *Roberson*, 999 F.2d at 1136 (*citing Perkins

v. Vt. Student Assistance Corp. (In re Perkins)*, 11 B.R. 160, 161 (Bankr. D. Vt. 1980)).

The Debtor argues that her efforts in obtaining the five forbearance agreements,

coupled with her telephone contact with Education, show that she has made a good faith

effort to repay the loan. The Court rejects this argument. The Debtor's procurement of the

forbearances does not demonstrate her good faith. As the Seventh Circuit has observed, "it

is hard to see good faith in paying nothing when obtaining payment deferrals. . . ." *Goulet*,

284 F.3d at 780. The Debtor has not availed herself of the ICRP, nor has she made any

attempts since the filing of her bankruptcy case in December of 2003 to repay anything on

the direct consolidated loan. Making only two $15.00 payments and obtaining five

forbearance agreements does not demonstrate good faith.

Further, as discussed *supra*, the Court finds that the Debtor has not minimized her

expenses and maximized her income. Indeed, the Debtor regularly incurs a variety of

unnecessary and excessive expenses. In addition, as discussed *supra*, the Debtor and her

spouse have not maximized their income. There is no evidence to suggest that the Debtor

cannot engage in full-time work. Nor is there any reason that the Debtor's spouse should be

unable to earn income for his family rather than bartering his services for other seemingly

-28-

unnecessary ones. Under all of the circumstances, the Court finds that the Debtor has not

satisfied the good faith prong of the test.


## V. CONCLUSION

For the foregoing reasons, the Court finds that the debt is not dischargeable under §

523(a)(8) as an undue hardship.

This Opinion constitutes the Court's findings of fact and conclusions of law in

accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be

entered pursuant to Federal Rule of Bankruptcy Procedure 9021.


ENTERED:

DATE: _____4/11/6_____      _____

                                John H. Squires
                          United States Bankruptcy Judge


cc: See attached Service List

## SERVICE LIST

### Clark v. Unites States Department of Education

**Adversary No. 05 A 01388**

Bradley H. Foreman, Esq.
The Law Offices of Bradley H.
Foreman, PC
6914 W. North Avenue
Chicago, IL 60707

Joel R. Nathan, Esq.
Assistant United States Attorney
219 S. Dearborn Street
Chicago, IL 60604

William T. Neary, U.S. Trustee
227 West Monroe Street
Suite 3350
Chicago, IL 60606

David R. Brown, Esq.
Springer, Brown, Covey, Gaertner &
Davis
400 S. County Farm Road, Suite 330
Wheaton, IL 60187